# EXHIBIT F

OFFICE OF COLLECTIVE BARGAINING
BOARD OF COLLECTIVE BARGAINING
-----------------------------------------------------------------------x

In the Matter of the Improper Practice Proceeding

-between-

UNIFORMED FIREFIGHTERS ASSOCIATION OF
GREATER NEW YORK, LOCAL 94, *IAFF*, AFL-CIO,

Petitioner,

-and-

THE CITY OF NEW YORK and THE FIRE
DEPARTMENT OF THE CITY OF NEW YORK,

Respondents.

-----------------------------------------------------------------------x

BCB- 4461 -21

**VERIFIED SCOPE OF
BARGAINING AND
IMPROPER PRACTICE
PETITION**

HAND DELIVERED

**TO THE BOARD OF COLLECTIVE BARGAINING**:

Petitioner, Uniformed Firefighters Association of Greater New York, Local 94, *IAFF*,

AFL-CIO (hereinafter "UFA" or "Union""), as and for its combined Verified Scope of

Bargaining and Improper Practice Petition, by its attorneys, Certilman, Balin, Adler & Hyman,

LLP, by Paul S. Linzer, Esq. and Jennifer A. Bentley, Esq., respectfully allege the following

pursuant to Title 61 of the Rules of the City of New York Office of Collective Bargaining

(hereinafter "OCB Rules") § 1-07 (b) and (c):

**PARTIES**

1.      Petitioner, the UFA, is the certified employee organization as defined by Section

12-303(l) of the New York City Collective Bargaining Law (New York City Administrative

7557679.1

Code, Title 12, Chapter 3) (hereinafter "NYCCBL") representing all Firefighters, Fire Marshals, Wipers, Pilots, and Engineers employed in the Fire Department of the City of New York pursuant to NYCCBL § 12-302.

2.      The UFA's principal place of business in 204 East 23rd Street, New York, New York 10010.  The UFA's telephone number is (212) 683-4832.  The UFA's fax number is (212) 683-0710.

3.      Respondent City of New York (hereinafter "City") is a public employer as defined by NYCCBL § 12-303(g) and is a duly constituted political subdivision of the State of New York and at all material times herein was a municipal corporation.  Bill de Blasio is the Mayor of the City of New York.

4.      Respondent Fire Department of the City of New York (hereinafter "FDNY" or "Department") is a municipal agency of the City as defined by NYCCBL § 12-303(d), and a mayoral agency as defined by § 12-303(f).  Daniel Nigro serves as the Commissioner of the FDNY.

5.      The parties have collective bargaining agreements for the ranks of Firefighters and Fire Marshals, as well as for Wipers, covering the period of August 1, 2010 through July 31, 2017, and for Pilots and Engineers covering the period of July 28, 2011 to July 27, 2018.  Unless specifically enunciated otherwise, the 2010-2017 CBA for Firefighters and Fire Marshals, the 2010-2017 CBA for Wipers, and the 2011-2018 CBA for Pilots and Marine Engineers shall be hereinafter, collectively, referred to as "CBAs" or "Agreements".

6.      At the time of the violations of the NYCCBL alleged herein, each of the CBAs for the ranks represented by the UFA were in a period of *status quo*.

2

7557679.1

## PRELIMINARY STATEMENT

7.       The UFA files this combined Verified Improper Practice and Scope of Bargaining Petition alleging that, in violation of NYCCBL §§ 12-306(a)(1) (4) and (5), the City and FDNY took managerial actions complained of herein, that interfered with the statutory rights of the UFA's members, breached the statutory duty to bargain in good faith regarding mandatory subjects of bargaining and created a *per se* and practical impact on the health and safety of the UFA membership, as well as failing to maintain the *status quo*.

8.       Furthermore, the UFA files this combined Verified Improper Practice and Scope of Bargaining Petition alleging that, pursuant to NYCCBL § 12-307(b) and OCB Rules § 1-07(b)(2)(i), the actions complained of herein by the City and the Department should be exempt from the managerial prerogative and must be collectively bargained to fruition or impasse.

## BACKGROUND

9.       Beginning in the summer of 2021, in response to the continuing COVID-19 pandemic and the surge of the Delta variant, City officials made multiple announcements regarding plans to have a citywide vaccination or testing choice mandate (hereinafter "vaccine or test mandate) for its public employees.

10.       The proclaimed vaccine or test mandate, which was not previously bargained over with any of the unions who represent the City's public employees, would require employees to provide proof of vaccination or to submit to weekly testing or suffer adverse financial and employment consequences.

11.       On August 2, 2021, Mayoral Executive Order No. 75 ("EO 75") was issued by Mayor Bill de Blasio requiring all new hires to "provide proof of having received at least one

3

dose of an approved COVID-19 vaccine prior to beginning their employment (unless they have a reasonable accommodation)".  EO 75 is annexed hereto as Exhibit A.

12.     On August 31, 2021, Mayoral Executive Order No. 78 ("EO 78") was issued requiring, *inter alia*, essentially, that all City employees must either provide proof of full vaccination by September 13, 2021; or provide proof of a negative COVID test on a weekly basis until such time the employee submits proof of full vaccination by September 13, 2021.  EO 78 is annexed hereto as Exhibit B.

13.     After the EO 78 was issued, the City made public statements acknowledging the obligation to bargain over the implementation of the vaccine or test mandate with the New York City Municipal Labor Committee (hereinafter "MLC"), whose member unions represent FDNY and other City employees.

14.     However, no bargaining ever occurred with the member unions, and at a meeting held on September 1, 2021, MLC representatives met with City leaders regarding the absence of any discussions relating to a vaccine or test mandate with any of the MLC member unions.

15.     Just prior to the September 13, 2021 deadline, on September 9, 2021, the President of the MLC wrote to City Hall "imploring" Mayor de Blasio to delay the start of the "testing mandate" scheduled for Monday September 13, 2021 until such time discussions could be conducted with the MLC member unions in order to work out protocols concerning a "vaccine or test policy", and to address questions as to why the vaccine or test policy was replaced with a vaccination-only policy for certain City workers.  The 9/9/2021 Memorandum from MLC President Harry Nespoli to Mayor de Blasio is annexed hereto as Exhibit C.

4

7557679.1

### 9/24/21 Issuance of the "New York City COVID Testing Mandate Procedure" on the UFA

16.     On September 9, 2021, the FDNY Chief of Operations John J. Hodgens verbally notified the UFA that a vaccine or test mandate as it relates to the FDNY would be delayed for approximately two weeks.

17.     On September 15, 2021, in a letter addressed to both the Office of Labor Relations Commissioner Renee Campion and FDNY Commissioner Daniel Nigro, the UFA cited the absence of any vaccine or test policy in the FDNY and demanded that the City and FDNY bargain with the UFA over any future policy or procedure related to COVID-19 vaccination or testing.  The 9/15/2021 Letter from UFA Labor Counsel Paul S. Linzer to Commissioners Campion and Nigro is annexed hereto as Exhibit D.

18.     On September 17, 2021, the FDNY, through its Bureau of Operations, issued Buckslip No. OPS-21-09-07 with the subject: "Information Regarding Vaccine Status and Mandatory COVID Testing".  OPS-21-09-07 is annexed hereto as Exhibit E.

19.     On September 22, 2021 FDNY Chiefs and UFA Board Members met virtually through Webex wherein FDNY Chiefs explained the mechanics of how the COVID testing procedure would operate and also stated that a stated that an additional written policy was forthcoming.

20.     On September 24, 2021, the FDNY, through its Bureau of Operations, issued Buckslip No. OPS-21-09-09 with the subject: "New York City COVID Testing Mandate Procedure" (hereinafter "COVID Testing Mandate Procedure").  The COVID Testing Mandate Procedure is composed of a Memorandum from Chief of Operations John J. Hodgens, dated September 24, 2021 (hereinafter "Hodgens Memorandum"), and a "FDNY COVID-SAFE

5

COMPLIANCE POLICY" (hereinafter "Compliance Policy").   The entire COVID Testing Mandate Procedure (OPS-21-09-09), which comprises both the Hodgens Memorandum and the Compliance Policy, is collectively annexed hereto as Exhibit F.

21.     The COVID Testing Mandate Procedure, which is the current procedure as of the date of the filing of the instant Petition, provides the UFA membership with the choice to show proof of vaccination or submit to weekly testing.

**Unilateral Implementation of the COVID Vaccine Mandate**

22.     On October 20, 2021, the New York City Department of Health and Mental Hygiene issued an Order (hereinafter "DOHMH Order"), *inter alia*, mandating that all public sector employees of the City must receive a vaccination(s) against COVID-19 by October 29, 2021 and provide proof of same.

23.     The DOHMH Order states that the previous vaccination or testing requirement applicable to certain staff shall be RESCINDED as of November 1, 2021 and will now be subject to this new Order.

24.     The DOHMH Order harshly advises that the failure of an employee to provide proof of a COVID vaccination by October 29, 2021 will subject an employee to be "excluded from the premises at which they work beginning November 1, 2021."

25.     A day later, on October 21, 2021, the FDNY issued a Buckslip with Operations Order 21-10-08 (OPS-21-10-08) with the subject "Covid Vaccine Update" which incorporates the DOHMH Order mandating vaccinations for all city workers as well as includes a 14-page Frequently Asked Questions ("FAQ") document attached.  The FDNY Ops Order OPS-21-10-08, with the attached DOHMH Order and FAQ document, is attached hereto as Exhibit G.

26.     The FDNY OPS Order OPS-21-10-08, entitled "COVID Vaccine Mandate Update" (hereinafter "COVID Vaccine Mandate Update") provides that "New York City now has a vaccine mandate …requiring City employees to submit proof of vaccination by <u>October 29 at 5pm</u>." *Id.*

27.     The COVID Vaccine Mandate Update states that "[f]rom October 20-29, 2021, employees will be eligible to receive $500 through payroll…if they receive their first vaccination dose during that time period." *Id.*

28.     The COVID Vaccine Mandate Update further provides that members may be considered for exemption from the COVID-19 vaccine mandate under limited circumstances, based on a religious or medical basis, and may file for a Reasonable Accommodation with the EEO Office but must be submitted by October 27, 2021. *Id.*

29.     It also states that all members who have been vaccinated outside of the FDNY shall follow procedures in Operations Buckslip 21-09-09 to provide proof of vaccination to the Department. *Id.*

30.     On October 22, 2021 in a letter addressed to the Office of Labor Relations Commissioner Renee Campion and FDNY Commissioner Daniel Nigro, the UFA demanded that the City bargain over the issuance of the DOHMH Order and the FDNY OPS-21-10-08 COVID Vaccine Mandate Update as well as any related procedures, including impact.  The 10/22/2021 Letter from UFA Labor Counsel Paul S. Linzer to Commissioners Campion and Nigro is annexed hereto as Exhibit H.

31.     The COVID Vaccine Mandate Update incorporates the DOHMH Order as well as a 14-page FAQ document, and hereafter will be referred to, collectively, as "Vaccine Mandate."

7557679.1

**Effects of the Vaccine Mandate on the UFA and the UFA Membership**

32.     The Vaccine Mandate replaces the former COVID Testing Mandate wherein UFA members retained a choice to submit proof of vaccination or submit to testing.

33.     The Vaccine Mandate prohibits employees who do not provide proof of a vaccination from entering work premises without further explanation. *See* Exhibit G.

34.     The looming October 29, 2021 deadline for compliance with the Vaccine Mandate is an egregiously unfair timeframe for compliance by which a member must choose between their personal medical freedom and their continued pursuit of their civil service rank and career in public service.

35.     Raising a slew of unanswered questions, the Vaccine Mandate prevents the ability of the UFA to have meaningful bargaining over the vast implications that this unilaterally imposed mandate has on all aspects of the lives and terms and conditions of employment of the UFA membership.

36.     The chaos and confusion caused by the rushed rollout of the Vaccine Mandate, has hindered the UFA's statutory obligation to effectively represent and advise its members on various issues concerning the many affected terms and conditions of employment.

37.     The Vaccine Mandate triggers an expansive list of mandatorily bargainable issues including but not limited to privacy, medical choice, confidentiality, discipline, leave, accruals, termination, compensation, financial benefits, work rules and overtime which give rise to all six claims enunciated herein, including a *per se* and practical impact on the safety of the membership.

7557679.1

38.     Furthermore, the Vaccine Mandate, in forcing members to choose receipt of vaccination over losing their livelihood, also implicates issues concerning a violation of one's bodily integrity, which affects the health and safety of UFA members.

39.     The Vaccine Mandate will punish a member by placing him or her on Leave Without Pay ("LWOP") status unless they comply with the vaccination medical procedure which many members find invasive, or unnecessary because they have demonstrable COVID-19 antibodies from a prior infection.

40.     Being placed on LWOP status raises concerns of maintenance of health insurance, benefits and other work-related financial terms affecting the lives of the members and their families, including contributions to health, welfare and annuity funds, and the timing of forced decisions relating to separation from service.

41.     Also, the Vaccine Mandate, in forcing some members to choose unpaid leave over vaccination, will lead to a shortage of Firefighters to respond to emergencies, exacerbating a work environment where the remaining members are already facing the adversities of working more than 24 hours consecutively, extreme fatigue, and the consequences of increasing numbers of illnesses and injuries.

42.     Moreover, the Vaccine Mandate sets forth a new basis for discipline, as well as disciplinary procedures which carry a new set of penalties with financial and life-altering consequences to which the membership may be subjected.

43.     In addition, the Vaccine Mandate will clearly affect the assignment and distribution of overtime.

9

44.     The failure of the City and FDNY to bargain over these, as well as other mandatory subjects of bargaining with the UFA to fruition or impasse prior to implementation of the Vaccine Mandate violates the NYCCBL, giving rise to the claims outlined below.

**FIRST CLAIM**
**SCOPE OF BARGAINING**
**AGAINST THE CITY AND FDNY**

45.     The UFA repeats and realleges each and every allegation contained in paragraphs "1" through "44" as though fully set forth at length herein.

46.     Under § 12-309(a)(2) of the NYCCBL, the Board "shall have the power and duty . . ., on request of a public employer or certified or designated employee organization to make a final determination as to whether a matter is within the scope of collective bargaining."

47.     The authority bestowed upon the Board by this specific provision differs from the Board's authority to rule on improper practice charges alleging a violation of the duty to bargain in good faith, as set out in NYCCBL § 12-306(a)(4).  *See Unif. Firefighters Assn.*, 43 OCB 4, 13-14 (BCB 1989) (holding that the BCB can differentiate between mandatory and non-mandatory aspects of a particular contractual demand).

48.     The instant matter involves unilaterally imposed changes to terms and conditions on employment that have been determined, in the past, by the BCB, PERB and New York Courts to be mandatory subjects of bargaining.  *See, e.g. Town of Carmel Police Benev. Ass'n Inc. v. Pub. Emp. Rels. Bd. Of State of NY*, 267 A.D.2d at 859 [1999]).

49.     The Vaccine Mandate represents new obligations and therefore new rules applicable to the UFA membership that did not exist prior to the implementation.

7557679.1

50.    OCB's authority is analogous to PERB's jurisdiction, and a new work rule affecting terms and conditions of employment is within the jurisdiction of OCB to determine. *See Matter of Town of Carmel Police Benev. Ass'n v. Public Empl. Rels. Bd.*, 85 NY2d 480, 486 [1995] (holding that PERB has "primary jurisdiction" to determine whether new work rule is a mandatory subject).

51.    Clearly, the Vaccine Mandate, including the LWOP provisions, implicates many mandatory financial subjects requiring bargaining, including the impacts on medical insurance, accruals and leaves of absence, vesting out or retiring, and the City's annuity fund or welfare fund contributions.

52.    Moreover, a work rule that involves discipline or termination are also matters affecting terms and conditions of employment.   *Matter of Levitt v. Board of Collective Bargaining of NY,* 79 NY2d 120 [1992].

53.    The threat of discipline including termination involves severe personal consequences to members and their families and affect terms and conditions of employment. *Id.*

54.    In addition, procedures relating to vaccination proof are bargainable and raise issues of medical privacy and confidentiality.

55.    Further, the DOHMH Order and FDNY Order impose new and distinct predicates for discipline, disciplinary procedures, and penalties regarding enforcement upon the membership, all which necessitate bargaining.

56.    Such new predicates for discipline carry severe financial and life-altering consequences and require good faith bargaining prior to implementation.

7557679.1

57.     Accordingly, the UFA demands the City and FDNY bargain over the procedures outlined in the Vaccine Mandate. *See* ¶¶37-44, *infra*.

58.     Based upon the foregoing, the Union has demonstrated that the topics set forth in the instant combined Petition involve mandatory subjects of bargaining and the Board, in accordance with its statutory authority, must declare the same to be mandatorily negotiable, and order that the City and FDNY engage in collective bargaining with the UFA related thereto.

## SECOND CLAIM
## <u>REFUSAL TO BARGAIN IN GOOD FAITH</u>

59.     Petitioner repeats and re-alleges each and every allegation contained in paragraphs "1" through "58" as if more fully set forth at length herein.

60.     Under the NYCCBL, the scope of issues subject to collective bargaining is established, inter alia, in NYCCBL § 12-307(a), which provides in pertinent part:

> a.  Subject to the provisions of subdivision b of this section and subdivision c of section 12-304 of this chapter, public employers and certified or designated employee organizations shall have the duty to bargain in good faith on wages . . ., hours . . ., [and] working conditions.

61.     According NYCCBL § 12-306(a)(4), it is an improper practice for a public employer "to refuse to bargain collectively in good faith on matters within the scope of collective bargaining with certified or designated representatives of its public employees."

62.     The Board has consistently held that NYCCBL § 12-306(a)(4) has been violated when a public employer fails "to bargain in good faith on wages, hours, and working conditions, as well as any subject with a significant or material relationship to a condition of employment."

12

*Unif. Firefighters Assn.*, 10 OCB2d 5, at 12 (BCB 2017) (citing *Utd. Fed. of Teachers, Local 2*, 4 OCB2d 54, at 10 (BCB 2011).

63.     The Board has further consistently held that "a unilateral change to a mandatory subject of bargaining is an improper practice because it constitutes a refusal to bargain in good faith." *See Unif. Firefighters Assn.*, 10 OCB2d 5, at 13 (citing *Asst. Deputy Wardens/Deputy Wardens Assn.*, 7 OCB2d 26, at 18, (BCB 2014).

64.     The burden of establishing a unilateral change to a mandatory subject lies with the party asserting such, and it must demonstrate "that (i) the matter sought to be negotiated is . . . a mandatory subject and (ii) the existence of such a change from existing policy." *Asst. Deputy Wardens/Deputy Wardens Assn.*, 7 OCB2d 26, at 18 (*quoting Dist. Council 37, Local 436*, 4 OCB2d 31, at 13 (BCB 2011).

65.     When discussing the existence of a change of an existing policy, the Board has held that: "[I]n determining whether a union has established a past practice, we look at whether the "practice was unequivocal and existed for such a period of time that union employees could reasonably expect the practice to continue unchanged." *Id*. at 13, citing *Local 621 Serv. Empl. Inter. Union*, 2 OCB2d 27, at 10 (quoting *County of Nassau*, 38 PERB ¶ 3005 (2005)).

66.     The unilateral implementation of the DOHMH and FDNY Orders clearly constitutes multiple violations of the NYCCBL.

67.     The provisions outlined in the unilaterally issued DOHMH Order and FDNY Order unequivocally implicate mandatory subjects of negotiation as they relate to the terms and conditions of employment of UFA members.

13

68.    Without question, the unilateral changes imposed constitute more than a *de minimis* change to an existing policy.

69.    It is legally indisputable that the changes to terms and conditions implemented by the Vaccine Mandate automatically trigger an obligation to negotiate under the NYCCBL.

70.    It is clear that the City and FDNY instituted these Orders without bargaining with the UFA.

71.    Based upon the foregoing, the Board must determine that the actions undertaken by the City and FDNY, as it violated § 12-306(a)(4) of the NYCCBL.


### THIRD CLAIM
### *PER SE* IMPACT ON SAFETY

72.    The UFA repeats and realleges each and every allegation contained in paragraphs "1" through "71" as though fully set forth herein.

73.    The NYCCBL proscribes public employers from refusing to bargain in good faith over mandatory subjects of bargaining. *See* NYCCBL § 12-306(a)(4).

74.    The NYCCBL further provides that: "It is the right of the city . . . to determine the standards of services to be offered by its agencies; . . . direct its employees; . . . maintain the efficiency of governmental operations; determine the methods, means and personnel by which government operations are to be conducted; . . . and exercise complete control and discretion over its organization." *See* NYCCBL § 12-307(b).

75.    The BCB has held that managerial decisions that fall within the above-enumerated categories are not mandatory subjects of bargaining. *See Unif. Firefighters Assn.*, 3

14

OCB2d 16, at (BCB 2010); *see also Emergency Med. Serv. Superior Officers Assn.*, 79 OCB 7, at 29 (BCB 2007).

76.   This managerial prerogative is not an unfettered right and is tempered by further language contained in this same provision: "[Q]uestions concerning the practical impact that decisions on the above matters have on terms and conditions of employment, including, but not limited to, questions of workload, staffing and employee safety, are within the scope of collective bargaining." NYCCBL §12-307(b).

77.   Essentially, "managerial action (or inaction) may be challenged . . . on the ground that it allegedly has had a practical impact on the affected employees' safety or workload." *Unif. Firefighters Assn.*, 43 OCB 70, at 3 (BCB 1989).

78.   The Board recognizes that there is a distinction between *per se* practical impact and a "regular" practical impact. *Unif. Firefighters Assn.*, 5 OCB2d 2, at 22 (BCB 2012).

79.   "[I]n order to find a *per se* practical impact exists . . ., the Board must be able to determine, based on the pleadings alone, and without the benefits of a hearing, that a practical impact exists." *Unif. Firefighters Assn.*, 4 OCB2d 30, at 29 (BCB 2011)

80.   The finding of a *per se* practical impact immediately triggers a duty to bargain, and the failure to bargain over a topic that is a mandatory subject of bargaining constitutes a violation of the NYCCBL § 12-306(a)(4). *See generally, Unif. Firefighters Assn.*, 5 OCB2d 2; *Unif. Firefighters Assn.*, 4 OCB2d 30; *Emergency Med. Serv. Superior Officers Assn.*, 79 OCB 7; *Unif. Firefighters Assn.*, 43 OCB 70; *Utd. Probation Officers Assn.*, 41 OCB 70.

7557679.1

81.     However, "the Board does not require a union to show that injuries have actually resulted from the management's action in order to demonstrate a practical impact on safety." *Emergency Med. Serv. Superior Officers Assn.*, 79 OCB 7, at 31.

82.     Based upon the facts set forth herein, the Vaccine Mandate has a *per se* impact on the health safety and workload of the UFA membership.

## FOURTH CLAIM
## <u>PRACTICAL IMPACT ON SAFETY</u>

83.     The UFA repeats and realleges each and every allegation contained in paragraphs "1" through "82" Board holds that matters involving a practical impact on employee safety are bargainable.

84.     Pursuant to NYCCBL § 12-307(a) and (b), as well as NYCCBL § 12-306(a)(4), a petitioner alleging that a practical impact on safety occurred as a result of management action covered under the managerial prerogative in the NYCCBL must demonstrate, with more than conclusory statements, the existence of a "clear and present or future threat to employee safety." *Unif. Fire Officers Assn.*, 3 OCB2d 50, at 18 (BCB 2010).

85.     However, as stated before, "the Board does not require a union to show that injuries have actually resulted from the management's action in order to demonstrate a practical impact on safety." *Emergency Med. Serv. Superior Officers Assn.*, 79 OCB 7, at 31.

86.     Moreover, the New York State Public Employment Relations Board has declared that "the general topic of safety of employees beyond the normal hazards inherent in their work is a mandatory subject of bargaining." *City of New York*, 40 PERB ¶ 3017 (2007); *see also County of Suffolk and Suffolk County Sheriff*, 43 PERB ¶ 4538 (2010).

87.     The Vaccine Mandate forces a member to undergo an invasive medical procedure which affects health and safety, thereby creating a practical impact.

88.     In addition, if members choose not to receive the vaccine, their placement on leave without pay status will affect the remaining UFA membership creating a workforce shortage and potentially both a practical impact on the safety and workload on the remaining members.

89.     The same factors that support a finding of a *per se* practical impact, can also compel the Board to find that that the Vaccination Mandate creates a practical impact on the safety of the UFA membership.

## FIFTH CLAIM
### UNILATERAL CHANGE DURING *STATUS QUO*

90.     Petitioner repeats and re-alleges each and every allegation contained in paragraphs "1" through "89" as if more though fully set forth at length herein.

91.     NYCCBL § 12-311(d) affirmatively states, in pertinent part, that: "During the period of negotiations between a public employer and a public employee organization concerning a collective bargaining agreement . . ., the public employer shall refrain from unilateral changes in wages, hours, or working conditions."

92.     A breach of this obligation constitutes a violation of NYCCBL § 12-306(a)(5), which states, in pertinent part:

> "It shall be an improper practice for a public employer or its agents . . . to unilaterally make any changes as to mandatory subjects of collective bargaining or as to any term and condition of

7557679.1

employment established in the prior contract, during a period of negotiations with a public employee organization as defined in subdivision d of section 12-311 of this chapter."

93.     The Board has held that "establishing a violation of NYCCBL § 12-306(a)(5) requires only that the change to a mandatory subject of bargaining be made during a period of negotiations." *United Fedn. of Teachers, Local 2*, 4 OCB2d 2, 11 (BCB 2011).

94.     Accordingly, the Board's analysis focuses on whether the topic in dispute constitutes a mandatory subject of bargaining, whether there was a unilateral change concerning this topic, and whether such a change occurred during a period of negotiations. *See Patrolmen's Benevolent Assn. v. City of New York*, 35 Misc.3d 1234(A), 953 N.Y.S.2d 522, **21 (Sup. Ct. N.Y. co. May 29, 2012) (overturning a BCB decision and holding that, under NYCCBL § 12-306(a)(5), "it is an improper practice to make a unilateral change to *either* the terms of the collective bargaining agreement *or* to a mandatory subject of bargaining during a period of negotiations").

95.     In the instant matter, it is irrefutable that the CBAs applicable to all UFA members are in *status quo*, given that the CBAs expired on either July 31, 2017 or July 27, 2018 and, to date, no successor agreements have been reached.

96.     Additionally, the decision to unilaterally promulgate the DOHMH and FDNY Orders constitutes, as previously set forth herein, unilateral changes to mandatory subjects of bargaining.

97.     Accordingly, the UFA has met its burden in establishing that this change implicates mandatory subjects of bargaining that occurred during a period of negotiations while the collective bargaining agreements were in *status quo*.

7557679.1

98.     Based upon the foregoing, the Board must find in favor of the UFA and grant the relief requested herein.

## SIXTH CLAIM
## DERIVATIVE INTERFERENCE

99.     Petitioner repeats and re-alleges each and every allegation contained in paragraphs "1" through "98" as if more though fully set forth at length herein.

100.    NYCCBL § 12-306(a)(1) provides, in pertinent part, that: "It shall be an improper practice for a public employer or its agents: to interfere with, restrain or coerce public employees in the exercise of their rights granted in section 12-305 of this chapter."

101.    The Board has consistently found that, when a public employer violates any provision of NYCCBL § 12-306(a)(2)-(5), that public employer "also derivatively violates NYCCBL § 12-306(a)(1)." *United Fedn. of Teachers, Local 2*, 4 OCB2d 2, at 10 (finding a derivative violation of NYCCBL § 12-306(a)(1) when the Board determined that the public employer failed to bargain in good faith and unilaterally changed a mandatory subject of bargaining during a period of negotiations); *see also Marine Empl. Beneficial Assn., Dist. No. 1*, 3 OCB2d 4, at 24 (BCB 2010).

102.    In the instant matter, the UFA has demonstrated that the City and FDNY unilaterally implemented a policy affecting mandatory subjects of bargaining without negotiating to fruition with the UFA.

103.    Accordingly, the Union has also established that the Department derivatively interfered with, restrained, and coerced the members of the UFA in the exercise of their rights under § 12-305 of the NYCCBL.

19

104.    Based upon the foregoing, the Board must find in favor of the UFA and grant the relief requested herein.

WHEREFORE, based upon the foregoing, Petitioner respectfully requests a Decision and Order from the New York City Board of Collective Bargaining as follows:

A. Finding that Respondents violated NYCCBL §§ 12-306(a)(1), (4) and (5) by unilaterally changing mandatory subjects of bargaining;

B.  Directing that Respondents cease and desist from implementing the DOHMH Order and the FDNY Order on UFA members;

C. Directing that Respondents rescind the DOHMH Order and FDNY Order;

D. Directing that Respondents bargain to resolution or impasse pursuant to the procedures of the NYCCBL;

E. Directing that the *status quo ante* before the unilateral changes be returned;

F. Ordering that conspicuous notices be placed throughout the Fire Department of the City of New York that the City and the FDNY have violated the NYCCBL;

G. Ordering a fact-finding hearing to determine whether the UFA has satisfied its burden of proof and persuasion as it relates to the alleged violations of the NYCCBL complained of herein; and

H. Ordering all other and further relief as the Board deems just and proper.

7557679.1

Dated:  East Meadow, New York
        October 26, 2021

                        **CERTILMAN BALIN ADLER & HYMAN, LLP**

                        By:_____
                            Paul S. Linzer, Esq.
                            Jennifer A. Bentley, Esq.
                            Attorneys for Petitioner UFA
                            90 Merrick Avenue, 9th Floor
                            East Meadow, New York 11554
                            (516) 296-7182

TO:    NEW YORK CITY OFFICE OF LABOR RELATIONS
       Attention:  Steven Banks, Esq., General Counsel
       22 Cortlandt Street, 15th Floor
       New York, New York 10007

       FIRE DEPARTMENT OF THE CITY OF NEW YORK
       Attention: David Zweifler, Esq., Director of Labor Relations
       Fire Department, City of New York
       9 Metrotech Center, Room 4W-13
       Brooklyn, New York 11021

7557679.1

## ATTORNEY'S AFFIRMATION

I, PAUL S. LINZER, the undersigned, am an attorney admitted to practice in the State of New York, and am the attorney of record for the UFA in the within action.  I have read the foregoing Verified Improper Practice/Scope of Bargaining Petition and know the contents thereof; the same is true to my own knowledge except as to matters therein alleged to be on information and belief, and to those matters I believe it to be true.  The reason this Affirmation is made by me and not by the Petitioner is because the Petitioner's place of business is in a county different from the one in which your deponent maintains his office.

_____
PAUL S. LINZER

22

7557679.1